**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 23, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2081**

**STATE OF WISCONSIN**

Cir. Ct. No. 2024JV58

**IN COURT OF APPEALS
DISTRICT II**

IN THE INTEREST OF J.A.V., A PERSON UNDER THE AGE OF 17:

STATE OF WISCONSIN,

    PETITIONER-RESPONDENT,

  V.

J.A.V.,

    RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Waukesha County: PAUL BUGENHAGEN, JR., Judge. *Affirmed.*

¶1    GUNDRUM, P.J.[1] Joshua[2] appeals from a nonfinal order of the juvenile court, contending the court erroneously exercised its discretion in waiving him into adult court. For the following reasons, we disagree and affirm.

## *Background*

¶2    The State filed a delinquency petition charging Joshua with 15 counts of possession of child pornography and one count of first-degree sexual assault of a child under the age of 13. The State alleged in relevant part as follows.

¶3    A detective received a CyberTip indicating someone at Joshua's address uploaded files depicting child sexual abuse material. The material included videos of adult men performing all manner of repulsive sexual acts with various male children from approximately six months old to twelve years old.[3] Sixteen-year-old Joshua admitted to law enforcement that he looked at child pornography and "sometimes" prefers very young children. He further admitted that when he was 14 years old, he took a 4-year-old boy into his bedroom, showed the boy pornography, and had the boy touch Joshua's erect penis for approximately five minutes.

¶4    About one year earlier, law enforcement had made contact with Joshua at his home in connection with a child pornography CyberTip they had

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

[2] A pseudonym for J.A.V.

[3] Because graphic detailing of the specifics of the various repulsive acts is unnecessary for resolution of this appeal, we will not detail them here.

received. With regard to that incident, Joshua's mother informed law enforcement she had found child pornography on Joshua's computer and had "wiped" the computer and was working to get Joshua help. A "Waiver Court Report" filed by Joshua's social worker, an employee of the Waukesha County Department of Health and Human Services, indicated Joshua was not charged with any offense in connection with that investigation.

¶5 Along with the delinquency petition, the State filed a petition for waiver of jurisdiction. The juvenile court held a hearing on the waiver petition, which hearing included testimony from a detective who investigated the current child pornography and assault allegations, Joshua's social worker, and a psychologist. The juvenile court determined waiver into adult court was appropriate and so ordered. Joshua filed a petition to appeal a nonfinal order, which we granted.

## *Discussion*

¶6 Joshua contends the juvenile court erroneously exercised its discretion in waiving him into adult court because it (1) "failed to consider Joshua's lack of a prior record" and (2) "misstated the length of supervision available to Joshua under the serious juvenile offender program." We conclude the court did not erroneously exercise its discretion.

¶7 Our supreme court has made clear that

> The decision to waive juvenile court jurisdiction under WIS. STAT. § 938.18 is committed to the sound discretion of the juvenile court. We will reverse the juvenile court's decision to waive jurisdiction only if the court erroneously exercised its discretion. A juvenile court erroneously exercises its discretion if it fails to carefully delineate the relevant facts or reasons motivating its decision or if it renders a decision not reasonably supported by the facts of

> record. In reviewing the juvenile court's discretionary decision to waive jurisdiction, we look for reasons to sustain the court's decision.

*State v. Tyler T.*, 2012 WI 52, ¶24, 341 Wis. 2d 1, 814 N.W.2d 192 (footnote omitted; citations omitted).

¶8 In deciding whether to waive a juvenile into adult court, the juvenile court "shall base its decision" on, as relevant: (1) the personality of the juvenile; (2) the juvenile's prior record; (3) the type and seriousness of the offense at issue; and (4) "[t]he adequacy and suitability of facilities, services and procedures available for treatment of the juvenile and protection of the public within the juvenile justice system, and … the suitability of the juvenile for placement in the serious juvenile offender program …." WIS. STAT. § 938.18(5)(a)-(c). Ultimately, to waive a juvenile into adult court, the juvenile court must conclude the State proved by clear and convincing evidence that "it is contrary to the best interests of the juvenile *or* of the public" for the case to be heard in juvenile court. Sec. 938.18(6) (emphasis added).

¶9 Joshua asserts the juvenile court erroneously exercised its discretion because in making its waiver determination, it "wholly failed to consider" and "simply ignore[d]" "the second statutory factor"—the juvenile's prior record, WIS. STAT. § 938.18(5)(am). Joshua is mistaken.

¶10 Early in its oral ruling, the juvenile court acknowledged that one of the criteria for its waiver determination was Joshua's "prior record, if any." In consideration of Joshua's overall record, the court noted that Joshua "found himself involved in, first, viewing adult pornography around the age of 11 and that graduated to child pornography." The court noted that Joshua "was consuming incredibly destructive material," recognizing not only "[t]he specific harm that's

done to the infants, toddlers and children" in the child pornography videos Joshua was consuming, but also "the damage that that causes to [Joshua], himself, by observing that at a young age and how that impacts him." The court recognized that Joshua "is essentially a victim in a lot of this as well," with the conditions at home being such that he was able to "consum[e] [such] incredibly destructive material."

¶11    The juvenile court further noted that

> at some point prior to … any prosecution start[ing], law enforcement had contact with [Joshua] and his family regarding child pornography. I understand that it was attempted to be dealt with at that point. Law enforcement didn't have any other contact other than meeting him one day at his home and, I guess, for lack of any better word … warning [him] about the type of conduct. My understanding through that is that his mother was aware of it [and] had disposed of that computer. That matter was closed out.

The court noted that "things didn't stop after the contact with the police. [Joshua] noted he knew how to re-install the app and get back to the files." The court also observed that Joshua's prior conduct was harmful to himself—he was a victim himself—because he "was leaving [his] home [and] having sexual encounters with … adult males," adding that this "is a large consideration for the [c]ourt as to the appropriateness of placement at home."

¶12    The second factor also includes consideration of Joshua's "motives and attitudes." *See* WIS. STAT. § 938.18(5)(am). Related to this, the juvenile court recognized that Joshua himself referred to his attraction to child pornography as "an addiction." The court also recognized that the facts related to Joshua's alleged assault of a four-year-old boy show that it was not a "youthful curiosity-type

5

issue[] that [led] to the sexual contact" but was "more akin to the planned out, premeditated steps of allegedly having a child come up to the bedroom."

¶13    In his brief-in-chief, Joshua refers us to the waiver court report submitted to the juvenile court by Joshua's social worker, which in addressing the "motives and attitudes" consideration of the second factor, indicated that Joshua "has expressed his remorse for the alleged offenses." The court saw things differently with regard to this consideration, however, noting that "the type of images [Joshua] was watching, what was described, … it flies completely contrary" to a "determination that he's empathetic, that he is remorseful and feels bad for the victims."

¶14    Thus, the juvenile court did consider the second factor, not only as it related to Joshua's "motives and attitude," but also as it related to his prior contact with law enforcement at his home regarding an earlier CyberTip, which investigation resulted in the matter being "closed out" after only a warning by law enforcement. With no other evidence of any other incidents of prior wrongdoing by Joshua having been presented to the court, obvious and implicit from the court's discussion regarding that one prior instance of contact with law enforcement is the fact that the court was aware Joshua had no other prior interactions with the justice system. Thus, the court did not "fail[] to consider" the second factor related to waiver.

¶15    Joshua also asserts the juvenile court erroneously exercised its discretion because it erroneously believed supervision under the serious juvenile offender program would end after three years whereas the relevant statute actually allows for five years' supervision. Joshua forfeited this argument.

6

¶16 In *State v. Benson*, 2012 WI App 101, 344 Wis. 2d 126, 822 N.W.2d 484, Benson argued he was entitled to resentencing because the circuit court sentenced him based on inaccurate information in an expert's report provided to the court. Specifically, he argued, as we phrased it, that the report "gave the court the mistaken impression that Benson had a level of Ambien in his system at the time of the crash which was well above the therapeutic level, suggesting he had misused the drug, and that the court relied upon this misimpression in fashioning Benson's sentence." *Id.*, ¶16. We concluded that "[b]ecause Benson's counsel himself submitted [the expert's] report to the court and failed to correct or object to the Ambien-related information prior to Benson's sentencing, Benson cannot now claim his due process rights were violated by the court's consideration of that same information. He has forfeited the issue." *Id.*, ¶17. We face a similar circumstance in this case.

¶17 During cross-examination of the social worker, the following exchange took place:

> [Joshua's counsel:] Okay. Now while the Department is not recommending placing [Joshua] in the serious juvenile offender program, this is a charge that does give the [c]ourt that option?
>
> [Social worker:] It does. It does. Our juvenile court can order this youth or stay an order for SJO, which would be relative to, I believe, a *three-year ability* for the youth to remain in that program for *three years* for additional supervision—
>
> [Joshua's counsel:] *And*—
>
> [Social worker:] —which would put him at about the age of 18.

(Emphasis added.)

7

¶18    Joshua acknowledges in his brief-in-chief that "[t]he [juvenile] court's belief that the serious juvenile offender program could only last for three years may have been based on incorrect testimony concerning the length of time that a court may place a child in the program," citing to this exchange between his counsel and the social worker. We see nothing else in the record that the court may have been drawing from when it indicated Joshua could only be supervised in the serious juvenile offender program for three years.

¶19    While counsel's initial question to the social worker did not specifically invite him to mention any length of time related to the serious juvenile offender program, by adding "And" during the exchange, counsel would have given the juvenile court the impression the social worker was correct in representing that supervision under the serious juvenile offender program was available for "three years." Counsel also then made no effort to correct the misinformation through either further testimony by the social worker or otherwise. Then, following testimony and argument by the parties, as the court was explaining its findings related to waiver, and before it announced its decision, the court stated:

> The [c]ourt is familiar that there is a possibility of serious juvenile offender programming that would extend supervision out for a couple of extra years. Actually, I should make sure I have it correct.… I'll put it this way, because it's not completely critical to the findings, … I would still have to look at if it's *three years* from the time he turns 18 or *three years* from the time of disposition that that can go out for. I believe it's *three years* from the time of disposition, but if I'm wrong on that, it would add essentially another year onto it if it's from the time he turns 18. But it's not dispositive for my determination here today.

(Emphasis added.) Counsel for Joshua made no objection to or effort to correct the court's apparent misunderstanding that supervision under the serious juvenile offender program could only last for three years.

¶20 Then, when later announcing its decision, the juvenile court stated:

> So the [c]ourt is finding on really two parts here, one, that the seriousness of this type of offense is one that is contrary to the best interest of the public to be dealt with in juvenile court. Also further finding that it's not in the best interest of the juvenile to only have a—yes, it is a significant time in the life of a juvenile, but as court officials, as people that deal with these types of issues, see these are not … 20-week programs, these are not one-year programs, these are not even *three-year* programs. Sadly at times, these are lifetime programs. I hope that is not the case.

(Emphasis added.) Counsel again made no objection to or effort to correct the court's belief that the serious juvenile offender program was only available for three years.

¶21 In light of this record, Joshua cannot be heard on appeal to complain about the juvenile court's understanding of the duration of the serious juvenile offender program when he, through counsel, gave indication that such an understanding was correct and made no correction or objection to the court's misunderstanding of a three-year limit.[4]

---

[4] "Application of the forfeiture rule is appropriate in many instances to ensure that parties and circuit courts have 'notice and a fair opportunity to address issues and arguments, enabling courts to avoid or correct any errors with minimal disruption of the judicial process.'" *State v. D.E.C.*, 2025 WI App 9, ¶67, 415 Wis. 2d 161, 17 N.W.3d 67 (citation omitted). The forfeiture rule, as our supreme court has stated,

> promotes both efficiency and fairness, and "go[es] to the heart of the common law tradition and the adversary system."

(continued)

¶22    For the foregoing reasons, we affirm.

*By the Court.*—Order affirmed.

This opinion will not be published.    *See* WIS. STAT. RULE 809.23(1)(b)4.

---

The … rule serves several important objectives. Raising issues at the [circuit] court level allows the [circuit] court to correct or avoid the alleged error in the first place, eliminating the need for appeal. It also gives both parties and the [circuit] judge notice of the issue and a fair opportunity to address the objection. Furthermore, the [forfeiture] rule encourages attorneys to diligently prepare for and conduct trials. Finally, the rule prevents attorneys from "sandbagging" errors, or failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal.

*State v. Huebner*, 2000 WI 59, ¶¶11-12, 235 Wis. 2d 486, 611 N.W.2d 727 (first alteration in original; citations omitted).